UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES N. McKELVEY,

    Plaintiff,                                      Hon. John Corbett O'Meara

v.

                                                Case No. 07-14538

PETE GEREN, SECRETARY
OF THE UNITED STATES ARMY,

    Defendant.
_____/

**ORDER GRANTING IN PART AND DENYING
IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the court is Defendant's motion for summary judgment, filed January 23, 2009. Plaintiff submitted a response on February 27, 2009; and Defendant filed a reply on March 6, 2009. The court heard oral argument on March 26, 2009, and announced its ruling from the bench, for the reasons set forth in more detail below.

**BACKGROUND FACTS**

Plaintiff, James McKelvey, filed this action against his former employer, the United States Army, alleging a failure to accommodate, discrimination, retaliation, and constructive discharge under the Rehabilitation Act. McKelvey is an Army war veteran who was injured by a roadside bomb while serving in Iraq in 2004. As a result of that injury, McKelvey lost his right hand, his left hand is disfigured and impaired, he has suffered from double vision, and he has a 25% reduction in his lung capacity. He takes prescription medication for nerve and arthritic pain. McKelvey took a disability retirement from the Army in December 2005.

On February 6, 2006, McKelvey was hired as a Chemical, Biological, Radiological,

Nuclear, and Explosive ("CBRNE") Operations Specialist in the Directorate for Plans, Training, Mobilization and Security ("DPTMS") at the United States Army Garrison – Detroit Arsenal. He was hired by Alan Parks, Director of DPTMS. McKelvey's job duties included reviewing plans, developing exercises to test the safety and security of the Detroit Arsenal, serving as a liaison with the Detroit Arsenal Fire Department, maintaining CBRNE Installation Support Team equipment, and training first responders.

Parks supervised Alvin Rabsatt, Maurice Spaulding, and Christopher Platz as well as Plaintiff, in a relatively small working environment. Spaulding and Platz shared an office and worked primarily as Force Protection Specialists. Rabsatt and Plaintiff shared an office and primarily performed CBRNE duties.

Shortly after he began his employment, McKelvey asked Parks about accommodations in the form of a touch-screen laptop or voice-activated programming for his computer. Approximately two or three weeks later, Parks tossed an outdated catalogue on McKelvey's desk and told him that he could look through it, "but there's no money for that kind of shit." McKelvey asked if he could load his personal voice-activation software on to his government computer, but Parks told him no. He felt at that point that any accommodations for his computer were a "dead issue."

McKelvey alleges that approximately one month into his employment he began to be subjected to verbal harassment based upon his disability. It began when his co-worker, Spaulding, confronted McKelvey for using "crippled parking" at a restaurant. McKelvey alleges that after that, Spaulding and Parks referred to McKelvey as "cripple" or "crip" and criticized his use of "cripple parking" on a "regular basis." Parks would give him directions like "go grab the

box, crip," or "go unload the truck, crip."  On one occasion, Parks directed McKelvey to use a large industrial shredder that McKelvey was uncomfortable using.  Parks responded, "Just fucking do it, cripple."  When a visitor inquired as to how McKelvey lost his hand defusing a bomb, Parks and Spaulding laughed and said, "Yeah, you must have done something wrong."  A co-worker told McKelvey that Parks was "bashing" him in meetings, saying "what a piece of shit you are, that he should have never hired you, that you're all fucked up from the war."

Elizabeth Fourtney, the Executive Officer for the garrison, met with Parks in her office approximately two or three months after McKelvey was hired.  During that meeting, Parks referred to McKelvey as a "worthless," "good for nothing" "cripple."  Parks told Fourtney that McKelvey was not competent to do any work so Parks would send him to assist Fourtney to move some boxes in her office.  Fourtney stated in her affidavit that "[b]ecause of his hostile attitude and tone during this meeting, I felt that Parks was going to direct McKelvey to move boxes only for the purpose of humiliating him, especially since the standard procedure was to have contracted movers handle the transportation of these items."  Pl's Ex. 2 at ¶ 9.  Although Fourtney voiced her disapproval, Parks told her he would send McKelvey to her office anyway.  He also stated that McKelvey was not happy and had threatened to go to Deputy Commander Robert Graves and Commander Kevin Austin.  "Parks chuckled as he told me that he gave Graves and Austin a 'heads up that the cripple was headed their way' and that Graves and Austin responded with 'bring it on' in an arrogant tone."  Id. at 13.

McKelvey also claims that he was "shunned" and isolated in the workplace, as the only person that would talk to him was Rabsatt.  He stated that he would go for a "week or more" without Parks or Spaulding speaking to him.  He often found himself without work assignments,

"virtually nothing" to do. When he asked for work, Parks told him he would "get back with you."

In May 2006, McKelvey met with Deputy Commander Graves to raise issues about his workload and the derogatory comments made about his disability. Graves told McKelvey that the comments were not "right and he'll take care of it." He also "leaned back in his chair and quietly warned me that 'there's an inner circle here and you better be careful because if you keep pushing it we're going to come after you.'" McKelvey at 82.

After McKelvey met with Graves, he alleges that the harassment from Spaulding and Parks continued. McKelvey met with Graves again in August 2006 to discuss "no workload, being shunned within the office, being referred to as a cripple, being asked to do things that I wasn't physically capable of doing" like carrying heavy boxes. Id. at 84-85. Again, subsequent to that meeting, his work environment did not change.

McKelvey met with an EEO counselor in September 2006. Although the EEO counselor encouraged him to file a complaint, McKelvey wanted to see if he could work it out himself first. Id. at 99. "I continued to try to talk to them and say enough is enough, sometimes a little more explicit than that, and by the December time frame I was done. I wasn't going to take it anymore." Id. McKelvey filed an EEO complaint in December 2006. After he filed the EEO complaint, the comments from Parks and Spaulding stopped. McKelvey perceived, however, that Spaulding continued to be "hostile" toward him.

Also subsequent to the EEO complaint, Graves completed a performance review of McKelvey. He gave McKelvey a "3" out of "5". This was the lowest rating of all the employees who reported directly to Parks. McKelvey contends that there was no objective basis for the

rating and he felt that it was the "kiss of death" for getting a promotion at the arsenal. The EEO officer stated that Graves must be "crazy" for rating McKelvey a 3 and felt the rating was a reprisal for McKelvey's EEO complaint.

The EEO officer suggested that McKelvey meet with Lt. Col. Austin. McKelvey voiced his concerns about his workload, an accommodation for his computer, the harassment, and other issues. He told Austin that he could not continue to work for Parks. Austin sent McKelvey to human resources to look for another position, but the only open one was for a security guard, which was on a lower pay scale and which could not be performed by McKelvey. Austin also told McKelvey that if he did not like the way he was being treated, he could go find another job. Austin did, however, work on getting McKelvey a touch-screen laptop or voice recognition software.

In the meantime, however, McKelvey applied for and obtained a job working for Oakland County. He submitted his resignation on February 16, 2007, effective March 2, 2007. He filed an amended EEO complaint on April 4, 2007, to add a constructive discharge claim. After 180 days passed without a final agency decision, McKelvey filed this suit on October 24, 2007.

## LAW AND ANALYSIS

McKelvey alleges a failure to accommodate, hostile environment, retaliation, and constructive discharge under the Rehabilitation Act of 1973, 29 U.S.C. § 701 et seq.

### I.   Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When

reviewing a motion for summary judgment, the facts and any reasonable inferences drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The party opposing summary judgment, however, must present more than a "mere scintilla" of evidence; the evidence must be such that a reasonable jury could find in favor of the plaintiff.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

## II.   Reasonable Accommodation

The parties agreed prior to the hearing to dismiss Plaintiff's reasonable accommodation claim, Count I of his complaint.  Accordingly, the court will grant Defendant's motion to dismiss that claim.

## III.   Hostile Environment Claim

Defendant contends that Plaintiff's hostile environment claim should be dismissed because Plaintiff did not properly exhaust his administrative remedies.[1]  Specifically, Defendant asserts Plaintiff's EEO complaint did not contain sufficient detail about his coworkers calling him a "cripple" and that Plaintiff did not fully cooperate in the administrative process because he declined to be interviewed in person.   "[T]he EEOC complaint should be liberally construed to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" Randolph v. Ohio Dept. of Youth Serv., 453 F.3d 724, 731 (6th Cir. 2006) (citation omitted).

---

[1] A federal employee who claims to be a victim of disability discrimination must exhaust his administrative remedies before filing suit in federal court.  See Horton v. Potter, 369 F.3d 906 (6th Cir. 2004).  The Rehabilitation Act adopts Title VII remedies and procedures, including exhaustion of administrative remedies. See 29 U.S.C. § 794a(a)(1); Wilson v. MVM, Inc., 475 F.3d 166, 173 (3d Cir. 2007).   Accordingly, Title VII cases are applicable to the exhaustion issues raised by Defendant here.

Although Plaintiff's formal EEO complaint does not contain the word "cripple," it does reference that Parks and Spaulding made "comments about my handicap and my parking situation." Pl.'s Ex. 10. Liberally construing the complaint, the court finds it is sufficient to encompass Plaintiff's claims in this suit.

Defendant also contends that Plaintiff's cooperation with the administrative process was insufficient, such that his administrative remedies should not be deemed properly exhausted. "A complainant's failure to cooperate in the administrative process precludes exhaustion when it prevents the agency from making a determination on the merits." Jasch v. Potter, 302 F.3d 1092, 1095 (9th Cir. 2002). Although Plaintiff declined to be interviewed, he did submit answers to written questions. Such cooperation is sufficient for exhaustion purposes, particularly in light of the fact that the agency chose not to dismiss Plaintiff's complaint for failure to cooperate, as it has the authority to do. See id. (finding exhaustion although the plaintiff did not provide a sworn affidavit, where the agency chose not to dismiss the complaint for failure to cooperate); Ward v. Florida Dept. of Juvenile Justice, 194 F. Supp. 2d 1250 (N.D. Fla. 2002) (holding that plaintiff exhausted administrative remedy, even though she did not respond to agency's request for information, where the agency did not dismiss the complaint for lack of cooperation).

Defendant also contends that Plaintiff's allegations do not rise to the level of a hostile work environment, characterizing them as "isolated incidents" that were not severe or pervasive enough to state a claim. In order to state a hostile environment claim, Plaintiff must show that (1) he is a member of a protected class; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability; (4) the harassment was severe and pervasive enough to unreasonably interfere with his work performance by creating an intimidating, hostile, or

-7-

offensive environment; and (5) the employer is liable.  Barrett v. Whirlpool Corp., 556 F.3d 502, 514 (6th Cir. 2009).  See also Mannie v. Potter, 394 F.3d 977, 982 (7th Cir. 2005) (assuming hostile environment claim under Rehabilitation Act mirrors claim under Title VII); Quiles-Quiles v. Henderson, 439 F.3d 1, 5 n.1 (1st Cir. 2006) (same).  The only dispute in this case is whether the alleged conduct is sufficiently severe or pervasive to create a hostile environment.

"Whether harassing conduct is sufficiently severe or pervasive to establish a hostile work environment is 'quintessentially a question of fact.'"  Hawkins v. Anheuser-Busch, Inc., 517 F.3d 321, 333 (6th Cir. 2008) (citations omitted).  In analyzing a hostile work environment claim, courts must "look at the totality of the circumstances."  Id. (citations omitted).

Viewing the evidence in the light most favorable to Plaintiff, the court concludes there is a jury question as to whether the conduct at issue was sufficiently severe or pervasive.  Plaintiff testified that he was called "cripple" or "crip" on a regular basis, was shunned and isolated by his coworkers and supervisor, was not given work assignments, and was directed to do things that he was not physically capable of doing, like carrying heavy boxes or using an industrial shredder.  Plaintiff testified that this continued over a period of months and was not remedied when Plaintiff complained to superior officers.  See Quiles-Quiles, 439 F.3d at 7 (holding plaintiff presented sufficient evidence of hostile environment when he was subject to "constant ridicule" based on his disability).  Although some of this conduct, when viewed in isolation, would not be actionable, the court must view the totality of the circumstances and not "carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode."  Jackson v. Quanex Corp., 191 F.3d 647, 660 (6th Cir. 1999) (citation omitted).

The court denies summary judgment as to Plaintiff's hostile environment claim.

**IV.     Retaliation**

Defendant also seeks summary judgment on Plaintiff's retaliation claim. Plaintiff alleges that he was retaliated against when he received a rating of 3 on his performance evaluation shortly after he filed his EEO complaint. Although Defendant contends that Plaintiff's rating was warranted, the ratings were admittedly subjective, according to the rater, Graves. According to Plaintiff, who got the lowest score in his group, performance ratings relative to one's peers were used to determine advancement within the garrison.

In order to establish a prima facie case of retaliation, a plaintiff must demonstrate that (1) he engaged in protected activity; (2) the defendant was aware of that activity; (3) the defendant took an adverse employment action against the plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment; and (4) there was a causal connection between the protected activity and the adverse employment action. See Barrett, 556 F.3d at 516. Plaintiff engaged in protected activity by filing an EEO complaint. Shortly thereafter, a superior officer who knew about the charge rated him lower than he thought he should have been rated, relative to his peers. Certainly, a negative performance evaluation could constitute an adverse employment action. See Vance v. Chao, 496 F. Supp.2d 182, 185 (D. D.C. 2007). Further, the timing of Plaintiff's relatively negative evaluation creates an inference that it was causally connected to the filing of his EEO complaint. Based upon the current record, Defendant has not met its burden of demonstrating that Plaintiff's retaliation claim fails as a matter of law.

**V.     Constructive Discharge**

Defendant also seeks summary judgment on Plaintiff's constructive discharge claim. In order to show constructive discharge, Plaintiff must demonstrate that 1) "the employer ...

deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to quit. . . ." Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir.1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." Id.

> Whether a reasonable person would have feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001).

As discussed above, Plaintiff has presented evidence that he was regularly called "cripple" or "crip" by his coworkers and supervisor, his coworkers and supervisor shunned and isolated him, he was not given work assignments, he was instructed to perform tasks that he was not physically able to do, and he was retaliated against when he filed an EEO complaint. On the other hand, after Plaintiff met with Lt. Col. Austin on January 11, 2007, the comments from Parks and Spaulding stopped, and although Spaulding was still hostile, Parks attempted to be more friendly and include Plaintiff in meetings. Austin also began working on getting Plaintiff an accommodation to help him use his computer. However, Plaintiff also alleges that Austin told him that if he did not like the way he was being treated, he should get another job. The only position available at the garrison was a security position that Plaintiff could not perform and that paid significantly less than his current salary. It does not appear from the record that Austin

attempted to investigate Plaintiff's claims or take any remedial action. Austin's alleged attitude likely did not give Plaintiff any reason to believe that his work environment–which a jury could find to be hostile–would substantially change. Although it is a close question, the court finds that there is sufficient evidence at this stage to allow the jury to determine Plaintiff's constructive discharge claim.

## **ORDER**

IT IS HEREBY ORDERED that Defendant's motion is GRANTED IN PART with respect to Count I and DENIED IN PART as to Counts II and III, consistent with this opinion and order.

s/John Corbett O'Meara
United States District Judge

Date: April 1, 2009

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, April 1, 2009, by electronic and/or ordinary mail.

s/William Barkholz
Case Manager