UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES N. McKELVEY,

       Plaintiff,                            Hon. John Corbett O'Meara

v.

                                       Case No. 07-14538

PETE GEREN, SECRETARY
OF THE UNITED STATES ARMY,

       Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW

Before the court are three post-trial motions filed by Defendant: (1) motion to alter or amend the judgment, filed October 30, 2009; (2) renewed motion for judgment as a matter of law, filed November 12, 2009; and (3) motion to vacate the front pay damage award, filed November 12, 2009.

## PROCEDURAL HISTORY

Plaintiff, James McKelvey, filed this action against his former employer, the United States Army, alleging disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 791 et seq. On October 23, 2009, a jury returned a verdict in favor of McKelvey, finding that he suffered a hostile work environment and was constructively discharged from his employment. Although the jury did not award damages for emotional distress, it awarded McKelvey $4,388,302 in front pay. In its post-trial motions, Defendant challenges the verdict, contending that the evidence was insufficient to support a finding of constructive discharge and that the court should order McKelvey to be reinstated to his former job in lieu of front pay.

## BACKGROUND FACTS

McKelvey is an Army war veteran who was injured by a roadside bomb while serving in Iraq in 2004.  As a result of that injury, McKelvey lost his right hand, his left hand is disfigured and impaired, he has suffered from double vision, and he has a 25% reduction in his lung capacity.  He takes prescription medication for nerve and arthritic pain.  McKelvey took a disability retirement from the Army in December 2005.

On February 6, 2006, McKelvey was hired as a Chemical, Biological, Radiological, Nuclear, and Explosive ("CBRNE") Operations Specialist in the Directorate for Plans, Training, Mobilization and Security ("DPTMS") at the United States Army Garrison – Detroit Arsenal. He was hired by Alan Parks, Director of DPTMS.  McKelvey's job duties included reviewing plans, developing exercises to test the safety and security of the Detroit Arsenal, serving as a liaison with the Detroit Arsenal Fire Department, maintaining CBRNE Installation Support Team equipment, and training first responders.

Parks supervised Alvin Rabsatt, Maurice Spaulding, and Christopher Platz as well as Plaintiff, in a relatively small working environment.  Spaulding and Platz shared an office and worked primarily as Force Protection Specialists.  Rabsatt and Plaintiff shared an office and primarily performed CBRNE duties.

Shortly after he began his employment, McKelvey noticed that he was not being paid for overtime.  When he raised the issue with Parks, the director "gave me a brief lecture about working for the Army requires sacrifice."  TR Vol. 5 at 60.  McKelvey felt that Parks was "irritated" with him for raising the issue.

Sometime later, McKelvey approached Parks about obtaining a touch screen laptop.

-2-

After that discussion, Parks tossed a catalog on McKelvey's desk and stated that "you can look through it, but there's no money for that kind of shit." Id. at 61.  McKelvey requested that he be allowed to load his own voice recognition software on to his work computer, but Parks denied the request.  After that, McKelvey did not discuss the issue further with Parks.

A couple of months later, a co-worker told McKelvey that "I've got word that your boss [Parks] is going around telling everybody you're all fucked up from the war, you're a piece of shit, that he should have never hired you, you're worthless.  And then he looked at . . . Alvin Rabsatt, and he's like, apparently you're the other piece of shit. . . ." Id. at 63.  When McKelvey and Rabsatt approached Parks about this, he denied it and told them "you're a great employee.  You guys are doing good work." Id.

About three months into his employment, McKelvey went out to lunch with his co-workers, Rabsatt and Bud Spaulding.  McKelvey drove his car to the restaurant.  When McKelvey pulled into a handicapped parking space, "Bud got pretty indignant about it." Tr. Vol 5 at 64.  McKelvey essentially responded that "it is none of your business." Id.  Spaulding "didn't push it any further.  I dropped it and went inside and ate." Id.

McKelvey testified that Spaulding referred to him as "lefty" or "cripple," which he saw at first as an attempt at "poor humor, and I kind of laughed it off and I didn't want to make an issue of it, so I kind of let it go." Id. at 65.

In around May or June 2006, McKelvey met with Deputy Commander Robert Graves.  At that meeting, McKelvey raised his concern that he was not being paid for overtime.  Graves responded, "that will never happen again.  Whatever hours you work you'll be compensated for. . . ." Id. at 66.  McKelvey also told Graves that he did not have enough work to do and requested

a touch screen laptop.  With respect to the laptop, Graves told him "not a problem, I'll look into it and I'll get back to you." <u>Id.</u> at 67.  McKelvey also raised the issue of Spaulding's comments, "I'm sure its meant in humor.  I told him not to say that I'm complaining about it, just, you know, maybe if you would just mention it on the side, it's really not appropriate for the workplace . . . I'm pretty thick skinned but that's not funny to me." <u>Id.</u>

According to McKelvey, Graves told him, "if I were you I wouldn't push any more subjects. . . . There is a small circle here, if you push it, they'll come after you." <u>Id.</u> at 68. McKelvey responded, "I didn't think this was high school anymore.  I just wanted to do what I have to do to work." <u>Id.</u> at 69.

After this meeting with Graves, McKelvey's group was relocated from Selfridge Air Force Base to the Detroit Arsenal in Warren, Michigan.  Apparently, the new location lacked sufficient parking.  McKelvey was assigned a handicapped parking space, which created friction with Spaulding, who "would go on that how I don't deserve handicapped parking because I'm not mobility impaired.  I'm just scamming the system, and both Bud and Al both regularly referred to handicapped parking as cripple parking." Tr. Vol. 5 at 70.  McKelvey testified:

> And from June towards August, the comments changed in tone.
> They didn't seem like they were meant to be a joke, and they were
> coming more frequently than previously. . . . Now, towards July
> and August, fucking cripple was starting to come out of there now.
> That was the big one.  It was usually as they turned to walk away
> over something, if they were agitated.  They'd mumble something
> under their breath, cripple, fucking cripple.  I didn't heard much
> lefty after that.  It was usually just cripple, cripple.

<u>Id.</u>

McKelvey met with Graves again in late August or early September 2006 to discuss the name calling and the parking issue.  Graves told him that he would look into it. <u>Id.</u> at 72-73.

-4-

Around the same time, McKelvey began to search for another job. Id. at 76.  McKelvey also met

with an EEO counselor at work, although he did not file a complaint at that time. Id. at 78-79.

      McKelvey testified that in September and October 2006, the name calling "picked up a

lot" to where he heard comments "especially from Bud [Spaulding], it seemed weekly . . . It was

always a comment whether about my handicapped, the cripple parking, or you know, just

agitated with me on one thing or another, would call me a cripple or fucking cripple." Id. at 80-

81.  Around the same time, however, McKelvey testified that he would exchange emails with

Spaulding to pass along jokes and discuss football. Tr. Vol. 5 at 105-106.

      In September or October 2006, Parks asked McKelvey to shred some documents.

McKelvey balked at using the large industrial shredder, which could "shred a whole book or half

a box of papers at a time.  And I said, you know, I don't feel comfortable.  I said I don't really

feel comfortable putting the only hand I have anywhere near that machine."  Id. at 81.  Parks

attempted to convince McKelvey that "the blades are far enough down.  Don't worry about it."

Id.  McKelvey refused, and "that's when he turned to me and said just do it, you fucking cripple,

and walked out." Id. at 82.

      After that, McKelvey and Rabsatt were not included in a meeting that McKelvey felt they

should have been invited to attend.  Id. at 83-84.  This prompted McKelvey to return to the EEO

counselor and file the EEO complaint in December 2006. Id.  McKelvey testified that after he

filed the complaint, Parks attempted to be more friendly toward him and to include him in more

meetings. Tr. Vol. 6 at 16.  He also stated that "after the complaint, they stopped calling me

names." Id. at 17.

      After he filed the EEO complaint, he met with Colonel Kevin Austin about his concerns.

Austin attempted to obtain a touch screen laptop for McKelvey.  Tr. Vol. 6 at 19-20.  According to McKelvey, however, Austin told him "if you don't like the way you're being treated, go find another job." Tr. Vol. 5 at 92.  Austin made him an appointment with Jason Bradley in human resources.  The only open position at the garrison  was a security guard at a much lower pay grade, which McKelvey did not pursue. Id. at 93.  He also declined to apply for a job as a CBRNE operations specialist at another installation, which would have required him to relocate. Tr. Vol. 6 at 23.

McKelvey did apply for a job as a planner for Oakland County's emergency management office.  He received an offer and tendered his resignation in February 2007, effective March 2, 2007.

## LAW AND ANALYSIS

### I.  Standard of Review

Having moved for judgment as a matter of law during trial, Defendant now renews that motion pursuant to Fed. R. Civ. P. 50(b).  In analyzing a motion for judgment as matter of law, the court does not "weigh the evidence, evaluate the credibility of witnesses, or substitute [its] judgment for that of the jury." Preferred Properties, Inc. v. Indian River Estates, Inc., 276 F.3d 790, 799 (6th Cir. 2002) (citation omitted).  Instead, the court views "the evidence in the light most favorable to the nonmoving party and decide[s] if it was sufficient to raise a genuine issue of material fact for the jury." Id. (citation omitted).  Granting a motion for judgment as a matter of law is appropriate "only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party."  Id. (citation omitted).

### II.  Constructive Discharge

-6-

Defendant contends that the evidence at trial was insufficient as a matter of law to support McKelvey's constructive discharge claim.  In order to show constructive discharge, Plaintiff must demonstrate that 1) "the employer ... deliberately create[d] intolerable working conditions, as perceived by a reasonable person," and 2) the employer did so "with the intention of forcing the employee to quit. . . ." Moore v. KUKA Welding Sys. & Robot Corp., 171 F.3d 1073, 1080 (6th Cir.1999). "To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." Id.

> Whether a reasonable person would have feel compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

Logan v. Denny's, Inc., 259 F.3d 558, 569 (6th Cir. 2001).  "The plaintiff must show more than a Title VII violation to prove constructive discharge, so the fact that plaintiff may have proven a hostile work environment is not enough by itself to prove constructive discharge also." Moore, 171 F.3d at 1080.  See also Pennsylvania State Police v. Suders, 542 U.S. 129, 134 (2004) (for constructive discharge claim, a plaintiff must show that, beyond the hostile environment, "the abusive working environment became so intolerable that her resignation qualified as a fitting response"); Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1015 (7th Cir. 1997) ("[U]nless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.").

Viewed as a whole, the evidence presented at trial is insufficient as a matter of law to

prove constructive discharge. Although McKelvey may have experienced a hostile work environment[1] at some point, he conceded that after he filed his EEO complaint in December 2006, the name calling stopped and his supervisor attempted to become more friendly and include him in more meetings. Further, Colonel Austin made efforts to provide an accommodation in the form of adaptive computer equipment. Based upon McKelvey's own testimony, his working conditions improved as his employer attempted to address his concerns. By the time McKelvey submitted his resignation in February 2007, there is little, if any, evidence that his work environment was so objectively abusive and intolerable that quitting was a fitting response. See Agnew v. BASF Corp., 286 F.3d 307, 310 (6th Cir. 2002) ("An employee who quits a job in apprehension that conditions may deteriorate later is not constructively discharged. Instead, the employee is obliged 'not to assume the worst, and not to jump to conclusions too fast.'"). Indeed, the evidence shows that McKelvey did not quit in response to intolerable working conditions or a hostile work environment, but because he received and accepted another job offer. Accordingly, the court will grant Defendant's motion for judgment as a matter of law on Plaintiff's constructive discharge claim.

## III.   Reinstatement

Further, even if Plaintiff had presented evidence sufficient to support his constructive discharge claim, the court finds that reinstatement, rather than front pay, would be the appropriate remedy. A district court has wide discretion to impose equitable remedies in order to "fashion the most complete relief possible" designed to "make the victims of unlawful

---

[1] Whether the evidence is sufficient to constitute a hostile work environment is not before the court.

discrimination whole." <u>Shore v. Federal Express Corp.</u>, 42 F.3d 373, 377 (6th Cir.1994) (quoting

<u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 421 (1975)).  The general rule is that the "injured

party is to be placed, as near as may be, in the situation he would have occupied if the wrong had

not been committed." <u>Fuhr v. School Dist. of City of Hazel Park</u>, 364 F.3d 753, 760-61 (6th Cir.

2004) (quoting <u>Albemarle Paper</u>, 422 U.S. at 418-19)).  Reinstatement is the presumptive and

preferred remedy in cases where discrimination has been proved.  <u>Id.</u>

  Defendant has offered to reinstate Plaintiff to a CBRNE Operations Specialist position in

Warren, Michigan, with a starting salary of $71,416, which is more than he was earning at the

time of his resignation.  Defendant notes that although Bud Spaulding and Alan Parks continue

to work at the arsenal, Plaintiff's first and second level supervisors, Wesley Crickard and Ralph

Sanders, would be new to him.[2]  Four of Plaintiff's six prospective co-workers would also be

new, with no involvement in this case.

  Plaintiff rejected this offer, testifying at trial that it made him "sick" and "nauseous" at

"the thought of going back there."  Tr. Vol. 5 at 98.  Plaintiff contends that "I can't go back there.

I can't go back to work with them.  It's impossible." <u>Id.</u>  Plaintiff's expert witness, Dr. Shiener,

testified that Plaintiff was quite "distressed" at Defendant's offer of reinstatement:

> My findings were consistent with what I found in the earlier
> examination of 2007.  But I also found that the prospect of a return
> to employment at The Arsenal brought back more intense
> symptoms of panic reactions.
>   He described opening the letter and reading it or hearing
> about it and having a sinking feeling in his chest, a sense of
> lightheadedness and sense of dread at the prospect of returning.
>   He had a sense of feeling trapped because he felt he might
> be compelled to accept that offer. . . . He was irritable, grouchy

---

[2] Graves and Austin have moved on to other posts.

> with his wife, hid from his family, didn't do much with his wife
> and child and he said I couldn't put my wife though that again.
>         So I concluded . . . because of his medical condition, his
> psychiatric illness I diagnosed, he wasn't capable of returning to
> work at the Army, not -- his aversion to it had caused increased
> psychiatric symptoms.  And a return to work would cause a
> deterioration in his condition.

10/16/09 Tr. 114-15.  Dr. Shiener, who is not Plaintiff's treating physician, admitted that

McKelvey did not tell him that, before he resigned, the name calling had stopped, Parks had

become more welcoming, and he was offered an accommodation. Id. at 151-52.  It is not clear

that Dr. Shiener was aware of the changes in personnel at the arsenal.  Neither Plaintiff nor Dr.

Shiener have identified current objective conditions at the arsenal that would make reinstatement

unworkable or inappropriate.  See Farber v. Massillon Bd. of Educ., 917 F.2d 1391, 1396 (6th

Cir. 1990) (court must consider the current facts and not "historical circumstances which no

longer may be present when the proposed reinstatement occurs").

        Although McKelvey may have some apprehension about returning to work at the arsenal,

such feelings likely exist in every discrimination case.  "The basis upon which reinstatements . . .

may be denied must be more compelling than the personal preferences and distrusts which

accompanied the initial discriminatory activity.  It is not enough that reinstatement might have

disturbing consequences, that it might revive old antagonisms, or that it could breed difficult

working conditions [because] [r]elief is not restricted to that which will be pleasing and free of

irritation." Farber, 917 F.2d at1396 (internal quotation marks and citation omitted).

        As noted above, the court has concluded that McKelvey did not suffer a constructive

discharge as a matter of law.  In the alternative, should the Court of Appeals disagree, the court

would find that reinstatement is the appropriate remedy here.[3]

## **ORDER**

IT IS HEREBY ORDERED that Defendant's post-trial motions are GRANTED,

consistent with this opinion and order.  Judgment will be entered in favor of Defendant.


s/John Corbett O'Meara
United States District Judge


Date:  January 27, 2010




I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, January 27, 2010, using the ECF system and/or ordinary mail.


s/William Barkholz
Case Manager

---

[3] If necessary, the court would also consider whether back pay from the date of termination until judgment is appropriate.

-11-